May it please the court. My name is Tiffany Hurst. I'm here from the Federal Public Defender's Office on behalf of Mr. Libby. In this case, we have a judge in a small rural town, the community of Winnemucca, where the 1990 census shows there were 6,500 people. In the county, there was under 13,000 people. So you had a very small jury pool and a very famous capital case, at least for that small rural community. There was a serious danger of publicity contamination due to a suppressed confession. These circumstances militated in favor of the judge taking great care in selecting the jury. Instead, the trial judge, inexplicably in picking the jury, rushed the process and, in some – in one instance, did not employ any process. And he, as a result, ran full hilt into every constitutional jury problem that one could come up with under these set of circumstances. He allowed the prosecutor to discriminate based on gender. He allowed biased jurors to sit. And he dismissed one-third of the veneer without any process at all. The U.S. Supreme Court ultimately remanded this case for a J.E.B. hearing based upon the discriminatory – the alleged – the possible discriminatory actions on behalf of the prosecutor. That seems to be the heart of your case as it comes to us right now. And here's what I would appreciate your focusing on. There's a great deal of argument here about whether we look at this through the AEDPA deferential lens or whether we're required to do de novo review. And I want you to assume for purpose of this question that we review de novo, as you would like us to do. I'm still having difficulty seeing why it is that your client would prevail under de novo review. It is true that all of the defense challenges were to men and all of the prosecution challenges were to women. But if you look at their answers, the actual people struck by the prosecutor had significant doubts. All but one had significant doubts about imposing the death penalty, which were not equivalent to the men's testimony about the same thing. For whatever societal or other reason, they actually, in fact, in their voir dire, had very different kinds of answers. And so I just want you to tell me why on de novo review we should conclude that there was gender discrimination as distinct from a legitimate reason. Well, first, Your Honor, you said all but one, and it only takes one discrimination against one juror. Well, he had other reasons for striking that juror. But most of it really seemed to me to center around this attitudinal question. Well, Your Honor, first I would say that there were other male jurors who sat who had concerns about the death penalty. They hesitated. They expressed that it would be a very difficult decision for them to make. And yet those male jurors were not challenged for that reason by the prosecutor. And I would suggest that if you look at the comparative analysis by comparing those two male jurors that I cited in the opening brief to which two jurors are you most concerned with? Well, in terms of the female juror who I believe should be compared to the male jurors, or at least I should say the one female juror that I think really makes this case as compared to those two male jurors, would be Anna Marie Smith. In connection with Anna Marie Smith, the prosecutor gave two reasons. One, that she and her husband owned a mom-and-pop hotel. And he was concerned that it would be difficult for her to focus because summertime was a busy season for them. Of course, jury selection took place in January. He also explained that he anticipated that there was going to be an interlocutory appeal at the beginning of the trial would be delayed. Which turned out to be exactly right on that. It turned out to be right, although I would suggest that anticipating striking a juror based upon one's anticipation that that female juror might have difficulty serving five months later is problematic. And she also was one who said it would be tough to impose the death penalty. And Mr. Bullock observed that she seemed very rattled when asked questions about the death penalty. Is that the same juror that I'm thinking about? It is, Your Honor, and actually Mr. Bullock said that she said it would be tough. But in rereading her testimony just yesterday, I didn't see the word tough used by her at all. In fact, it was used by a different juror. What she said was that she could impose the death penalty, that she was not the type of person who believed in the death penalty, but then couldn't actually impose it if called upon to do so. And that although it could be of concern if she were the only person responsible for giving a death sentence, she – those concerns were alleviated because there were 12 jurors who would have to agree to give the death penalty. And she said that both in response to defense questioning and in response to the prosecution questioning. So I would suggest that the – that her testimony simply doesn't support Mr. Bullock's post hoc rationalizations for excluding her on the basis. Well, you refer to them as post hoc, but aren't we – even on de novo review, wouldn't we be bound by the credibility determination that was made that Mr. Bullock actually could remember because of what you started out by saying, which is this was the biggest thing ever to happen in this county, and it was really, really, really memorable to him, and so on and so forth? So we do have to believe that his memory was intact. I would suggest that the finding – that you do not have to defer to the finding that his memory was intact, because when you look at the totality of his testimony, the only areas where he was able to testify in part based upon memory without referring – constantly referring to his notes involved a few of the statements made that were found in the transcripts themselves. But when – By the way, I wanted to go back to the transcript on Ms. Smith, because Bullock asked, sir, based upon that, can you tell us in your own words what you believe about the death penalty? He answered, boy, that's really tough. Your Honor, however, that was in response to a different – in response to a different question, though. He didn't make – And the toughness, I would suggest, if you look at the context of that statement, was involved with actually telling him why she was – she did not hesitate in saying that she believed in the death penalty. And she did not hesitate when asked if she believed in the death penalty. Well, she was asked ultimately whether she could impose it, and she said, I really can't answer that right now. I really can't tell you yes or no. I'd have to go through the trial. I can't tell you that. So, I mean, she wasn't terribly reassuring, and I just wonder why that isn't a legitimate ground for a prosecutor to use. Well, I think that if you compare it to the testimony of the male jurors, the context of that statement was simply that she couldn't tell until she heard the evidence. That was something that several of the male jurors said. They couldn't tell whether the death penalty could be given until after they heard all the evidence. The part that's difficult about this – I mean, the strength of your argument is that you've got words on a page that do appear to be similar. The weakness in your argument is that we have no idea about demeanor. And we have no way of judging that. That's the weakness in a comparative analysis, which is why in cases like Miller L. or our decision in Kessler, we have looked to very, very explicit kinds of things that were referenced, for example, in Kessler, you know, race, where the prosecutor offered race-based reasons as part of his explanation. And I just don't see that in this record. So we have the whole sort of personal aspect of this that we just cannot judge off the comparative. If you're looking at absolute words, I think you've got some real strength to your argument. But we don't have any idea about demeanor here. And I have two responses to that. The first is that that goes to why the reconstruction that occurred eight years later was extremely problematic and should not be given any deference. Because when you look at the testimony of Mr. Bullock, he, too, couldn't remember demeanor. He – for the most part – he constantly indicated that he did not have an independent recollection in many areas about the jurors that he was questioned on – questioned on in terms of how they appeared. So while we don't have that in front of us, I would suggest that's part of the problem in this case. Neither did the lower court. It was not an appropriate case for reconstruction. What do we do about the fact that that's essentially what the Supreme Court ordered? Well, actually, the Supreme Court said if it could be done. And the fact was it couldn't be done. Well, it could be done. Your view is it couldn't be done as well as you would like it to have been done, but it could be done. And the prosecutor remembered, and it's credible that he remembered, because as you began your own argument, this – this was a huge deal. Small community. He knew most of these jurors, at least by sight. It was his last murder case as a prosecutor, and – and it was very vivid to him. So I guess I'm not sure why it's not a case in which a reconstruction is available. I would suggest that despite all of those factors, when you read his testimony closely, there were so many responses that indicated that he did not have an independent recollection of what had transpired. Again, we're working off of a – we're working off of a transcript here. So we're trying to discern, you know, where the pauses were. And I can hear – I can hear conversations in my head as I read these transcripts. And then I can go back and read them again and sort of put different actors in my head and come up with a different reading of this thing, which is why we have a trial judge who's sitting there watching Bullock testify and then making a decision as to whether he thinks Bullock is testifying accurately. Now, what do we do when we've got a – a judge on the street who's watching – watching it in real time? I would suggest two things. One, this is the same trial judge who dismissed one-third of the jurors without any process. This is the same trial judge who, despite evidence that of juror contamination, refused to hold – Are you suggesting the judge had an obligation to recuse himself? I'm suggesting that – Is that an argument you've preserved? That this Court actually, based upon the totality of the circumstances of how this particular judge handled – Is that the test we use for – for judging judges? I would suggest that – Under ADFA? Under ADFA, the judge's assessments of Mr. Bullock is – are colored by how he handled the entire jury selection process and that this Court is entitled to look at the entire – the entire manner in which he handled the jury selection process. And – It's hard to have a perfect selection process in these circumstances, I think you'd agree. You raise a number of questions with respect to juror bias. Could you – what do you think is the – is the strongest issue, argument you have there? Well, I would suggest that the strongest in connection with juror bias – and if I – if I could just answer one question. One – say one more thing in response to Judge Bybee's question and then move to that answer. The other thing that I think that – that this Court should consider in terms of evidence on the record of gender discrimination is the comment made by co-counsel. Even though co-counsel – the prosecutor's co-counsel was not doing the jury selection, I would suggest that it's clear that they were conferring and that he was an active part of the process. And the comment where he indicated that he wouldn't want a nice young juror or a nice young lady serving on the jury in a capital case is indicative of a mindset that was present in this case. I understand that there was context in connection with that comment and ways that one could try to explain it away, but I would emphasize that the U.S. Supreme Court has indicated that comments like that does implicate a paternalistic viewpoint of why female jurors are not qualified to serve in capital cases. And to return to the other question that was put before me, I would suggest that the – it was of most – it was of significant concern that the Court did not consider the implied bias of Susan Brown, and I would suggest that this Court can consider that de novo because that wasn't reached by the Nevada Supreme Court and it should have been. This is a situation where Susan Brown clearly lied by omission on the record in that she was specifically asked whether she had spoken to anyone about the case or whether she had heard anything in the media about the case, and she did not raise her hand. And that was a lie by omission. And the only reason we found out about it was because an ex-prosecutor contacted defense counsel and told defense counsel that she had done this. So I would suggest that her failure to raise her hand and admit that this had occurred constituted an eagerness to be on the jury that was problematic for the defense from the perspective that we were dealing with jurors who were potentially exposed to a – to a confession, which is one of the most damaging pieces of evidence that one could have as a defendant in a trial. And the fact that – I'm sorry. I thought you were going to – The fact that she indicated that she only inadvertently read the last line of a newspaper article is somewhat incredible given that first most people see the headlines and kind of go from there. But even if it were true, the fact that she did not – that she was not truthful in response to the judge's questions is indicative of implied bias in this case. My question to you is whether there is any relevance to our analysis of the fact that all of the defense peremptories were used against men. No, Your Honor. I don't think there was any relevance because you can't – you don't know whether that was due to the fact that defense counsel saw that the prosecution was using all of their peremptory challenges on women or if it was just an independent strategy employed by defense counsel or – you just don't know what the context of that was. But for the purpose of the analysis, it has to do with whether just one juror was not properly allowed on this jury for gender reasons. And if that is the case, then that's a problem. Thank you, counsel. We'll hear from the other side. Ms. Proctor. Thank you, Your Honors. Good morning. My name is Heather Proctor with the Nevada Attorney General's Office, and I have the honor of representing the Respondents in this matter. With regard to the Batson issue, I would defer to our answering brief in terms of the comparative analysis regarding each of the women and the male jurors, unless the Court has specific questions. As to – Keep your voice up a little bit. Of course, Your Honor. The acoustics here aren't perfect. Okay. As to prospective juror Anna Marie Smith, Mr. Bullock did give two very specific explanations as to her. His main concern for her was her potential financial hardship. He knew that – and she testified that while she had no current concerns as to serving on the jury regarding the hotel that she ran with her husband, if this had been during the summer, then she would have some concerns. Yes, Mr. Bullock anticipated an interlocutory appeal. He had a concern that there would be some delay in bringing this case back to trial. And he knew Mrs. Smith personally, and he knew that this would be a hardship on her. Mrs. Smith was the only individual who testified as to a potential financial hardship if this were to occur during the summer. The only other individuals who testified to any kind of potential hardship was Mr. Messer, and he testified that if he and one of his colleagues from the post office would have to serve on the jury, that would leave the post office shorthanded. That is not the same or equivalent to – Did she testify that there would be a hardship? She testified it would be more difficult if this had occurred during the summer. But at the time, the trial did reconvene in April. At the time of the jury selection in February, she said it wasn't a problem right now, it was a slow season. But in the summer, it would be a problem, because that was when the – Mr. Bullock stated that that was when tourists increased in – Concern that it might affect her attention. Correct. That she would be nervous about it. It might distract her about it. Regarding Mrs. Smith, further, as you noted – Excuse me. How long did the trial take? It took five weeks, I believe. And jury selection took approximately a week. In terms of Mrs. Smith, she was the only one that Mr. Bullock actually testified as to actual demeanor that she was rattled with the question of whether, when she found out that the jury would be the ones to fix the penalty rather than the judge. He knew her, didn't he? He knew her very well. He knew her. He said he testified – I believe he testified that he knew her best of any of the potential jurors. So he – and he did question her about her hesitancy. This first came up when defense counsel was asking questions. When it became the State's responsibility to start asking her questions, he did pursue it further. When he asked her about her beliefs in the death penalty, she did say, really, she'd never thought about it. It was a tough question, and it depended on the case. So there was some hesitancy on her part before she said, yes, I do believe in the death penalty. The other jurists who – the male jurists really never went into concerns regarding their beliefs in the death penalty. It was a question as to their imposition of the death penalty. Her main rattlement and her concerns were, I didn't know the jury was going to have to do this. I'm not sure I can do this. I would have to go through. So her standing is very different and is not similarly situated to any of the males if you consider not only her responses to the death penalty questions, but also her responses regarding a potential financial hardship. Unless the Court has any questions regarding any of the other dismissed female jurors. Regarding the reconstruction, as the Court noted, the reconstruction was done on remand from the United States Supreme Court to address the JEB issue. The petitioner never actually challenged the reconstruction in their briefs. Excuse me, the amended petition. Well, they challenged the results of it. They didn't challenge that it could be done. Correct. They did not challenge the reconstruction itself. They only challenged the explanations that were provided. In terms of the reconstruction, Mr. Bullock stated numerous times that his memory had been refreshed under applicable Ninth Circuit law that is sufficient to use circumstantial evidence in order to refresh recollection. No U.S. Supreme Court case has stated an individual cannot refresh their recollection with circumstantial evidence such as the transcript. Mr. Bullock did have some difficulty with his memory, but that was to recall very specific answers and responses. That did not stop him from saying, I know why I dismissed this juror. It was because of her hesitancy towards the death penalty. It was because of her difficulty with circumstantial evidence. It was because of her difficulty with reasonable doubt. That did not demonstrate that he didn't have a specific recollection of this individual or the reason he dismissed that individual. It was only that he didn't memorize a very specific response to those questions. Regarding Mr. Newman's testimony, when read in context, first of all, Mr. Newman's testimony was that he was concerned regarding the maturity of a particular female jurist. He also testified, and Mr. Bullock testified, that he said, no, I'm not going to listen to that. I think I know her family. I know this individual. I think she'd be a good juror. Moreover, both individuals testified, both Mr. Newman and Mr. Bullock testified, that Mr. Bullock was the one who made the final determinations regarding jury selection, and there has been no demonstration that Mr. Newman's single statement regarding Ms. Chesser, who is the young female in question, had any impact or had any gender discrimination bias on Mr. Bullock's part during jury selection. Unless the Court has any other questions regarding the Batson question, regarding the question on jury misconduct or alleged jury misconduct, regarding Ms. Brown, the Petitioner seeks to have implied bias because of her responses. However, they have not shown that Ms. Brown lied during her responses to the questions presented by the Court. In Dyer v. Calderon, the Court held that honest yet mistaken answers to Vordyer questions rarely amount to constitutional violations, and even intentionally dishonest answers are not fatal so long as the falsehood does not speak of a lack of impartiality. Mrs. Brown testified she only read the last sentence of an article. She did not say that she read the entire article or the headline of the article. She also specifically testified she had no idea of the nature of that claim or that she knew the question before the Nevada State Supreme Court. She did ask a question of Mrs. Shane. However, she did not ask a question as to the facts of the case. She only asked a general question as to how long this is going to take in the Nevada Supreme Court. That does not demonstrate that Mrs. Brown lied during her testimony. Finally, Mrs. Brown did testify that she could remain fair and impartial to the case. The Petitioner has not demonstrated that there is implied bias or actual bias on the part of Mrs. Brown. And the applicable Supreme Court case in this Smith v. Phillips requires only that there is an ‑‑ if there is an implication of jury impartiality, the judge must conduct some investigation. A hearing may be conducted. It's not required. And the hearing must allow both parties to provide testimony and to provide evidence. That's what occurred in this case. The judge's investigation in this case was conducted, and the judge ultimately made a factual finding that she was not biased. With respect to the article, the article was about the appeal concerning the confession, so that the ‑‑ it was about the confession. Correct. And she said she only read the last line, and she didn't read anything else and didn't know, essentially didn't know what it was about. Is that plausible? I believe it is, Your Honor. The court had in the ‑‑ excuse me, let me start over again. The defense had admitted into evidence the articles that had been printed during the two‑month lag between the jury selection and the jury being recalled for trial. The court had those articles in front of it, and it had ‑‑ this particular article was issued in February, shortly after the jury was excused for the appeal. And so the court had in front of it the articles. And so the court could look at the article, could look at that last sentence, see that it says that ‑‑ I mean, we're reading into it at this point. We don't know for sure, but the court did have in front of it, Libby's appeal is pending in the vast Supreme Court. That could have been the entire content of that last sentence. We don't know. But the court certainly had that information in front of it and could have made a factual finding based on that information that, all right, just based on that one sentence, I'm not finding that she knew anything about the content of that appeal. Do you often read just last sentences of articles? I actually don't read newspapers. I've got digital age. But she also testified that she was being very cautious about reading newspapers. In fact, her husband was keeping newspapers for her for this period during the trial and that she was avoiding reading any of the newspapers. So there is no evidence that she did, in fact, know about the confession or the basis for the appeal. Unless the Court has any questions regarding that or any of the other issues. I don't believe we do. Thank you. Thank you, Your Honors. Dale Matthews, one of the jurors, stated, I don't think I would like to determine the death penalty. I think I could do it, but I wouldn't like the idea. Tim Messmer stated he would rather not vote upon the death penalty, but that he thought he could do it. I think I could. It isn't one I would probably cherish doing. And neither of those jurors were stricken by Mr. Bullock, and I would suggest that those responses are not any different from the responses given by Ann Marie Smith. And I also would emphasize that the prosecutor indicated that it was his concern about her hesitancy regarding whether she could impose the death penalty. That was the issue, not her views on the death penalty, which she was very, very clear of, clear on. And so I would emphasize that her answers in terms of whether she could impose the death penalty were not any different from those given by two male jurors who actually sat. Thank you, counsel. The case just argued is submitted, and we appreciate very much the helpful arguments from both of you. We'll take about a five-minute break.
judges: SCHROEDER, GRABER, BYBEE